UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                          CRIMINAL CASE NO. 3:11-CR-143-H

DONTE PULLUM, et al.                                        DEFENDANTS

**FINDINGS OF FACT
CONCLUSIONS OF LAW
AND RECOMMENDATION**

**FINDINGS OF FACT**

This matter is before the Magistrate Judge by order of the District Court to

consider the joint motions of Defendants Detrick Houseal, Ronald Wells and Marcelo Carrillo[1]

to suppress intercepted electronic communications (DN 137, 164).  Defendants Houseal and

Wells, along with three other individuals, are charged by federal indictment with conspiracy to

possess with intent to distribute 1000 kg of marijuana and with possession with intent to

distribute the same.[2]  They now seek to suppress from evidence all information obtained by the

Government pursuant to two Title III wiretaps.

The primary argument raised by the defendants is that the two affidavits

submitted by DEA Agent Brendan Cryan to obtain wiretap authorization fail to satisfy the

"necessity requirement" of Title III of the Omnibus Crime Control and Safe Streets Acts of

1968, 18 U.S.C. §§5510-5520.  Defendants in particular focus their efforts on the first affidavit

of Sept. 6, 2011.  In their view, the affidavit does not establish that traditional investigative

---

[1]  Defendant Marcelo Carrillo has joined in the motion to suppress (DN 164).

[2]  Defendant Houseal is separately charged in count 3 of the same indictment with being a
convicted felon in possession of multiple firearms (DN 45, p. 2).

techniques would be, or had been, inadequate or otherwise unlikely to succeed, as required by the statute.  See 18 U.S.C. §2518(1)( c ).  Further, they maintain that the affidavit by its very structure is materially misleading so as to justify an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).  We have addressed the *Franks* argument by separate order and now address the adequacy of the September 6 affidavit in light of the necessity requirement.[3]

**The Affidavit of September 6th**

The affidavit of September 6th details an ongoing drug trafficking investigation of Defendant Pullum (DN 137, Ex. 3, Cryan Aff., pp. 10, ¶12; p. 23, ¶37).  The facts and circumstances section of the 40-page affidavit reveals that in April of 2010, law enforcement agents were involved in a separate investigation of a drug trafficking organization run by Michael McCarthy.  That investigation involved information provided by a confidential source (CS) who told the agents that Donte Pullum was a cocaine customer of Robert Posey, himself a member of McCarthy's organization (DN 137, Ex. 3, p.10, ¶12).

Law enforcement officers arrested 26 members of McCarthy's organization, seized 40 kg of cocaine and some $4 million in cash that April.   McCarthy and another gang member, Tyran Jenkins, were among those arrested on cocaine conspiracy charges (Id.).  Certain members of the McCarthy organization agreed to cooperate, along with the CS, to provide

---

[3] Because the defendants orally argued the merits of their motion to suppress intercepted electronic communications at length during the recent hearing on the *Franks* issues, the Court has determined that additional oral argument on the merits is not required, particularly given the well-drafted motion papers of the Defendants. (DN 137, 164).

information to DEA and ATF agents (DN 137, Ex. 3, Aff. p. 11, ¶¶12-13).  One of them told the agents that Robert Posey, on April 5, 2010  had delivered 5 kg of cocaine taken from a garage on Valley Station Road to Pullum's residence at 2203 Amboy Drive in Louisville (Id., ¶¶14-16). Surveillance by law enforcement confirmed this delivery, along with the arrival of a vehicle registered to Detrick Houseal minutes after Posey's arrival with the cocaine.  (Id.).

The following year beginning on June 22, 2011, agents conducted a series of three searches, or "trash pulls," from  the garbage set out at Pullum's Amboy Drive residence (DN 137, Ex. 3, p. 12, ¶17).  The initial trash pull resulted in the discovery of a note requesting "Donte" to call a specific phone number.  Two other trash pulls, on July 20, 2011, and July 27, 2011, produced no useful information.

As part of their investigation, on July 5, 2011, agents installed a video surveillance camera outside of the Amboy Drive residence.  Agents monitored this fixed video camera through July 21, 2011 (Id. p. 13, ¶18).  During this time, they observed Pullum driving a number of different automobiles in and out of the property (Id.).  The vehicles included a black Pontiac G8 sedan, a gold Hummer H2, a black Buick LaCrosse sedan, and an Audi SUV (Id.). On July 13, 2011, law enforcement officers secretly installed a hidden GPS tracking device on the black Pontiac G8 sedan registered to Pullum (Id., p. 13, ¶19).  Later, on August 5, 2011, government agents installed a separate hidden GPS tracker on the gold Hummer H2, which was also registered to Pullum (Id., p. 17, ¶28).

In the interim, analysis of the GPS tracking data from the Pontiac G8 revealed that on July 16, 2011, the G8 was driven to Indianapolis, Indiana, where it remained for a brief period of time before returning to Louisville at 4 a.m., on July 17, 2011.  (Id., p. 13, ¶19).  Video

surveillance showed Pullum to be the operator of the vehicle (Id.).  Incoming call data from cell tower records for Pullum's cellular telephone confirmed that Pullum, and his cell phone, had traveled to Indianapolis and back that day (DN 137, Ex. 3, p. 14, ¶20-21).  Cell phone records during this same two-day period showed "a spike of call activity" that included 21 phone calls with Houseal over approximately three hours in the late evening/early morning hours, with an additional 6 calls in the early evening of July 17 (Id., ¶21).  On the afternoon of his return, GPS tracking data from the Pontiac G8 showed that Pullum made a series of short stops throughout Louisville.  The historic GPS data of Pullum's cellular phone also confirmed these short stops, which law enforcement officers concluded were for the purpose of delivering marijuana and cocaine that Pullum had obtained in Indianapolis.[4] (Id., p. 15, ¶23).

On August 1, 2011, the hidden GPS tracker on the Pontiac G8 showed that the vehicle traveled from Louisville to Memphis, Tennessee, where it remained for approximately 11 hours before it began its return drive to Louisville on the following morning of August 2, 2011 (Id., p. 15, ¶24).  Agents made arrangements for the Kentucky State Police (KSP) to execute a vehicle stop near Bowling Green, Kentucky, during the return trip (Id., p. 15-16, ¶25).  KSP troopers observed the Pontiac G8 to be traveling northbound on I-65 in tandem with a white GMC van.  The van appeared to be driven by a Hispanic female, and the Pontiac by a white male with a Hispanic passenger (Id.).

A KSP trooper stopped the van.  During the stop, a drug dog brought to the scene alerted for the presence of illegal narcotics.  (Id.) An ensuring consent search produced seven

---

[4] Agents received a court order on July 21, 2011, that authorized the receipt of historic cell phone GPS location data for Pullum's cell phone.

sealed bags believed to contain hydroponic marijuana, or "hydro."  (DN 137, Ex. 3, p. 16, ¶25).

Police arrested the driver of the van, Evelyn Garcia, on charges of trafficking in marijuana and

driving on a suspended license (Id.).

       The state police stopped the Pontiac G8 at the next Bowling Green exit for

making an illegal U-turn (Id., p. 16, ¶26).  The Pontiac was being driven then by Jeffrey Driskell

(Id.).  His passenger was Jose De-Jesus Martinez (Id.).  Although a drug dog at the scene

positively alerted, no illegal narcotics were found in the vehicle.  At the time, Driskell explained

to the troopers that he had borrowed the Pontiac G8 to drive to a strip club in Nashville,

Tennessee.  Driskell was unable to give the officers the name of his passenger, Martinez, who

could not correctly state the date of his alleged birth shown on the Mexican ID card he produced.

Martinez also did not know the name of the driver (Id.).  Phone records for Pullum's cell phone

revealed a number of calls during this August 1-2 time period.  Agents believed the calls were

made to coordinate the transportation of marijuana by Garcia and Driskell from Memphis to

Louisville, as well as, to discuss the seizure  of the marijuana by the police (Id., p. 17, ¶27).

       The affidavit then discusses events of August 14-16, 2011.  (DN 137, Ex. 3, pp.

17-22, ¶¶28–33).  On August 14, 2011, the hidden GPS tracker on Pullum's Hummer indicated

that it traveled from his Amboy Drive residence to 8817 Old Bates Rd in Louisville, Kentucky.

It returned home briefly and then continued onward to a local hotel, where the Hummer

remained for a brief period of time before again returning home (Id. pp. 17-18, ¶28).  Pullum's

cell phone records during the evening and early morning hours of Aug. 13-14, showed 75 calls,

including 12 calls to Houseal's cell phone (Id., p.18, ¶29).  Agents consequently concluded that

these communications on Pullum's cell phone involved the coordination of additional marijuana

and/or cocaine deliveries.

The following day on August 15, 2011, GPS tracking data from the Hummer revealed that it traveled to 4802 Pinewood Avenue, a commercial garage located in an industrial area of Louisville (Id., ¶30).  The wiretap affidavit notes at this point that the McCarthy drug trafficking organization also used a similar commercial garage building located at Valley Station Road to store vehicles and conduct drug transactions (Id., pp. 18-19, ¶30).  Physical surveillance at 4802 Pinewood Ave. revealed three vehicles at the site that day  (Id., ¶31).  The vehicles included Pullum's Hummer, a white Ford van, and a white Ford F250 Superduty pickup truck with attached trailer.  Pullum was seen driving the Hummer, and two unidentified males were the drivers of the van and the F250 truck (Id., ¶31).  The F250 truck was observed to have  Georgia license plates and was registered to a Barbara Smith of Menlo, Georgia (Id.).

When the vehicles left the garage, agents maintained physical surveillance of the F250 truck after it split away from the Hummer and the white Ford van, which were traveling in tandem.  The F250 truck was stopped later on I-65 South by a KSP trooper near Bowling Green, Kentucky (Id. p. 19, ¶32).  The trooper confirmed that the vehicle was driven by Warren Smith, who had in his possession a Georgia motor vehicle operator's license (Id.).

Other agents continued to follow the Hummer and the Ford van as the two vehicles returned to Amboy Drive, where the van parked at the rear of the driveway (Id. p. 19, ¶33).  Pullum and the unidentified van driver then departed in Pullum's automobile, which drove to the Whispering Woods apartment complex. The other driver exited Pullum's vehicle at the complex (Id.).  Pullum was then seen driving his Hummer back home, where agents watched as he placed several large black bags into the back of the vehicle later that day (Id., p. 20, ¶33).  He

6

then departed from his home in the Hummer (Id., ¶34).

Pullum drove about Louisville making a series of short stops at different residential and commercial locations for the next hour (Id.).  Included among his stops was a brief visit to the "Clipper City Barbershop" at 2330 Broadway, a business operated by Dontay Penny (DN 137, p. 20, ¶34).  A review of Pullum's cell phone records for August 15, showed a number of calls between Pullum and Penny, who the agents believed was a broker for drug transactions between Pullum and his customers (Id., p. 20-21, ¶35).  Agents concluded based on their observations, GPS tracking data and cell phone records that Pullum had loaded his gold Hummer with cocaine and/or marijuana contained in the four black bags and then set about making deliveries to various customers including Penny (Id.).  During these events, Pullum's cell phone records show that he spoke nine times to (502) 669-2107, the same phone number that he spoke with from his cell phone on 13 occasions between August 13-14 (DN 137, Ex. 3, p. 21-22, ¶36).  No subscriber information was available for this number.

On August 16, 2011, a U.S. magistrate judge authorized a pen register trap and trace for Pullum's cell phone (N 137, Ex. 3, p. 22, ¶37).  Review of the pen register records for Pullum's phone for a 30-day period ending on August 17, 2011, revealed 1,585 phone calls involving Pullum's cell phone during this time period.  Of the 1,585 calls, 93 calls involved Houseal's cell phone number (Id., ¶37a).  Pullum's cell phone also called or received 415 calls from the previously-mentioned (502) 669-2107 phone number.

Beginning in Part VII, the affidavit sets forth the alleged necessity for wiretap authorization (DN 137, pp. 23-38, ¶¶39-71).  Agent Cryan explains in this section why the interception of wire communications on Pullum's cell phone "is the only available technique that

7

has a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt" that Pullum and others are engaged in operating a drug trafficking organization with multi-state sources of supply (Id., p. 23, ¶39). Agent Cryan advises that the use of traditional investigative techniques has failed to conclusively identify all the conspirators, their sources of supply, couriers, distributors or customers "or to define the full nature and scope of the organization." (DN 137, Ex. 3, p. 24, ¶40). Cryan then continues in the affidavit to discuss each traditional investigative technique to explain just how it has been inadequate in the context of the present investigation. These techniques include: pen register and phone record analysis (Id., p. 24-25, ¶¶42-45); confidential sources or undercover agents (Id., pp. 25-28, ¶¶45-52); physical surveillance (Id., pp. 29-31, ¶¶53-59); fixed video camera surveillance (Id., p. 32, ¶¶60-61); search warrants (Id., pp. 32-33, ¶62a-d); use of tracking devices (Id., pp. 32-25, ¶¶63-66); administrative subpoenas (Id., p. 36, ¶69); grand jury subpoenas (Id., p. 37, ¶70); and interviews with target subjects (Id., pp. 37-38, ¶71).

On Sept. 6, 2011, the District Court authorized an Title III wiretap for target telephone I, (502) 439-3029, based on Agent Cryan's initial affidavit (DN 137, Ex. 3). The following month on Oct. 11, 2011, the same court authorized a second Title III wiretap based on a 58-page affidavit also prepared by Agent Cryan (DN 137, Ex. 2). The second wiretap application again authorized the interception of target telephone I, along with target telephone II, (502) 235-1664, a cell phone subscribed to by Detrick Houseal (DN 137, Ex. 2, p. 3, ¶5b). This second Title III wiretap authorization is not the immediate focus of the Defendants' motion to suppress. Rather, Defendants focus on the alleged deficiencies of the initial affidavit, which they claim is the primary basis for the second wiretap authorization of Oct. 11, 2011. Accordingly,

the focus now falls on the legal adequacy of the September 6 affidavit.

## CONCLUSIONS OF LAW

**The Defendants' Title III Arguments**.

As noted, the joint motion to suppress focuses on the "necessity requirement" of 18 U.S.C. §2518(1)( c ).  Section 2518(1)( c ) requires that an application for a Title III wiretap provide "a full and complete statement as to whether or not other investigative techniques have been tried and failed or why they reasonably appear to be unlikely to succeed if tried, or to be too dangerous."  Id.  Defendants insist that the affidavit supplied by Agent Cryan on Sept. 6, 2011, fails to satisfy this requirement for a number of reasons.  They essentially maintain that, when the affidavit is examined in chronological fashion, the unadorned facts show that law enforcement officials failed to give traditional investigative techniques sufficient time to work before they sought permission for electronic interception; and, that those same traditional techniques, in fact, proved to be highly successful even during the abridged 8-week period they were used.

In fact, the Defendants maintain that investigators in the Pullum case made "relatively quick and substantial progress" by the use of "multiple, complementary techniques" which if continued would have yielded further fruitful, incriminating evidence without any need for a Title III wiretap authorization.  As for the Government's insistence that traditional techniques would be futile or dangerous, Defendants dismiss this portion of the affidavit as being "largely boilerplate generalities about drug trafficking investigations, unconnected to the specific

9

facts of the Pullum case...."  (DN 137, p. 2).  They argue that only by the use of such nonspecific boilerplate, along with an overstated "vast investigative purpose," could the Government hope to establish necessity in part VII of the affidavit.  A closer examination of each of the traditional investigative techniques, in light of its success in the Pullum case, convinces the Defendants that the Government has failed to show strict compliance with this vital requirement under the statute.

**The Law of Title III.**

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§2510-2520, is a comprehensive scheme for the regulation of governmental electronic surveillance that prohibits the Government from secretly intercepting electronic communications except as authorized by the courts based on wiretap applications that meet all the requirements of the Act.  *See Dalia v. United States*, 441 U.S. 238, 249 (1979); *United States v. Lambert*, 771 F.2d 83 (6th Cir.), *cert. denied*, 474 U.S. 1034 (1985).

In certain respects, the statutory standards to obtain a wiretap are similar to those required for a search warrant. Both require the existence of probable cause for example.  *See United States v. Alfano*, 383 F.2d 158, 161 (6th Cir), *cert. denied*, *Palazzolo v. United States*, 488 U.S. 821 (1988).  *See also, United States v. Poulsen*, 655 F.3d 492, 503 (6th Cir. 2011, *cert. denied*, __U.S.__, 132 S. Ct. 1772 (2012) ("[A]n affiant for a wiretap application must (1) demonstrate the wiretap is necessary (2) demonstrate that it is narrow and particular and (3) meet the standard of probable cause.").  The particularity requirement is a second common element of both search warrant and Title III authorization.  *Id.*  Necessity, however, is not a common

feature.

The necessity requirement exists in essence because Title III creates a statutory presumption against the authorization of electronic communication interception, unless all its requirements are met. *See United States v. Giordano*, 416 U.S. 505, 515 (1974). Consequently, under 18 U.S.C. §2518(1)(c), the Title III wiretap applicant must, as part of the application process, give a full and complete statement about whether other investigative procedures have been tried and failed, or appear unreasonably unlikely to succeed or to be too dangerous if attempted. *Id*. This statutory requirement to show necessity serves multiple purposes. *See United States v. Williams*, 693 F. Supp.2d 745, 750-52 (E.D. Mich. 2010). It serves to limit the use of otherwise highly intrusive wiretaps by ensuring that they are not resorted to when traditional investigative techniques would be sufficient to achieve the goals of the investigation. It further protects against the impermissible use of a wiretap as the initial step in a criminal investigation. *Williams*, 693 F. Supp.2d at 751 (citing *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007)).

The Government bears the burden to show necessity under §2518(1)(c). Although significant, this burden is not an impossible one by any means. In fact, the Sixth Circuit has held that the Title III applicant's burden "is not a heavy one." *United States v. Lambert*, 771 F.2d at 91; *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir.), *cert. denied*, 434 U.S. 855 (1977) ("The Seventh Circuit in *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir. 1976) has held that 'the Government's burden of establishing compliance with [§2518(1)(c)] is not great.'"). The applicant merely must demonstrate that the Government gave "serious consideration to the non-wiretap techniques prior to applying for wiretap authority" and explain why under the

circumstances such techniques would be, or had already proved to be, inadequate. *United States v. Steward*, 306 F.3d 295, 305 (6ᵗʰ Cir. 2002).

   The Government is not required to prove that obtaining information by traditional means is impossible. *Alfano*, 383 F.2d at 164. *See also, Poulsen*, 655 F.3d at 504 (Applicants need not "prove that every other conceivable method has been tried and failed."). The mere fact that some investigative techniques were successfully employed to uncover evidence of crime does not mean that the court must conclude no need exists for wiretap surveillance. *Stewart*, 306 F.3d 305. The requirement of necessity is simply to ensure that a wiretap is not the first step in a criminal investigation. *Giordano*, 416 U.S. at 515; *Landmesser*, 553 F.2d at 20. Put differently, "wiretaps are not to be used thoughtlessly or in a dragnet fashion." *Alfano*, 838 F.2d at 163.

   The finding of a district court that the Government has satisfied the necessity requirement of 18 U.S.C. §2518(1)(c) is afforded considerable discretion. *Stewart*, 306 F.3d at 304. *See also, Landmessser*, 553 F.2d at 20 (The issuing judge enjoys considerable discretion in making a practical and commonsense judgment about the sufficiency of the Government's showing.); S. Rep. No. 1097, 1968 U.S. Code Cong. & Ad. News, p. 2190 (Congress intended that the showing envisioned by §2518(1)(c) be tested "in a practical and commonsense fashion."). In reliance on this practical and commonsense approach, the courts of the Sixth Circuit have held that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *Landmesser*, 53 F.2d at 20 (quoting *United States v. Steinberg*, 525 F.2d 1126, 1130 (2ⁿᵈ Cir. 1975)).

   When evidence contained in a Title III wiretap application reveals that various

members of a drug conspiracy have facilitated their criminal enterprise through multiple telephone conversations using various phones from numerous locations, and the Government could not have uncovered the full scope of the conspiracy without wiretaps, then the authorization of a Title III wiretap will not run afoul of the necessity requirement. *Stewart*, 306 F.3d at 305-06. *See also, Landmesser*, 553 F.2d at 20-21 (same) (discussing *Steinberg*, 525 F.2d at 1130); *United States v. Cooney*, 26 Fed. Appx. 513, 522 (6th Cir. Jan. 22, 2002), *cert. denied*, 535 U.S. 1118 (2002)

The appropriateness of a wiretap authorization in the investigation of large-scale drug conspiracy is discussed at length in *United States v. Dickerson*, 651 F.Supp.2d 739, 741-42 (N.D. Ohio 2009). In *Dickerson*, the court distinguished between those drug investigations that seek to gain evidence against a single individual and those investigations that target ongoing drug trafficking organizations. *Dickerson*, 651 F.Supp.2d at 741-742. As *Dickerson* explains:

> The touchstone for evaluating compliance with §2518(1)(c) is the purpose of the investigation. If the purpose simply is to gain evidence against a single individual, and, perhaps to find him in possession of contraband, [electronic] surveillance, at least in a drug case, would almost never be justified. Too many other, more direct and less intrusive means exist to gain evidence as to one person.
>
> But in this case, as in most, if not all cases involving federal drug investigations, the Government's purpose was considerably more than simply apprehending a single individual. Rather, as is also commonplace where the object is to up-root and exterminate a drug distribution organization, the agents wanted to learn who was involved, what they were doing, not just with themselves, but with others, how they were doing it, and where they were doing it. In addition, the agents decide to connect drugs and individuals, to improve the likelihood of a successful prosecution.
>
> Where that is all - - in other words, where the investigation focused solely on those involved locally, so that they could be

13

apprehended and convicted - - a heightened showing of necessity might arguably be needed.

But the focus and objectives in this case were not limited to the Toledo area.  Of greatest importance was attempting to ascertain who else was working elsewhere with the targets to provide drugs to them for distribution locally.  This is the objective in most, if not all federal drug cases involving Title III applications and orders.  Indeed, the federal government alone has the resources and interstate jurisdiction to engage in coordinated, multi-state investigations of such interstate and international activity.

Here, therefore, the agents did not want simply to hear the defendant talking to others about his activities, involvement of others locally, and where he himself might keep his drug supply and store drug trafficking proceeds.  Rather, the agents wanted to try to learn who else he might be talking to and working with in the alleged drug endeavors.  Even though they may have known some of that information from pen registers and similar techniques, they would not know who was on the other end of the line, or hear them speaking about the crimes being investigated.

Here, the objectives of the investigation, though commonplace and conventional, and a recurrent hallmark of Title III drug applications, were, nonetheless, not directed narrowly.  Instead, the agents wanted to find out where and how drugs were getting into the targets' hands, who was agreeing to send them and arranging for them to get here, and when and how they would be coming.

*Dickerson*, 651 F. Supp.2d at 742 (footnote omitted).  The United States argues in its response that this is exactly the situation in the present case where agents were attempting to ferret out Pullum's drug suppliers in both Tennessee and Indiana.

While courts in the Sixth Circuit have repeatedly approved the use of Title III wiretaps to investigate broad-ranging drug conspiracies, court approval for the use of such intrusive electronic interception will not be routinely granted if the tendered affidavit lacks meaningful factual context in its description of the investigative techniques employed and their possible shortcomings.  In other words, "a purely conclusory affidavit unrelated to the instant

14

case and not showing any factual relations to the circumstances at hand would be, in our view, an inadequate compliance with the statute." *Landmesser*, 553 F.2d at 20-21.  Such "boilerplate" affidavits are inadequate precisely because they do not provide a detached judge with adequate facts on which to determine whether alternative traditional investigative procedures are a viable alternative to the more intrusive electronic interception authorized under Title III.  *See United Stated v. Williams*, 693 F. Supp.2d 745, 751 (E.D. Mich. 2010) (citing *United States v. Kalustian*, 529 F.2d 585, 590 (9th Cir. 1975) ("Mere conclusions by the affiant are insufficient to justify a search warrant ... or a wiretap order.").

Where a Title III wiretap application fails to satisfy the necessity requirement under §2518(1)(c), "the fruits of any evidence obtained through that warrant must be suppressed." *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007).  Until the Defendant carries his or her burden of overcoming the presumption that a wiretap authorization is proper, however, the authorization will be presumed to be lawful. *United States v. Kelly*, 596 F. Supp.2d 1132, 1143 (E.D. Tenn. 2009), *affirmed*, 459 Fed. Appx. 527 (6th Cir. 2012), *cert. denied*, __U.S.__, 133 S. Ct. 261, 184 L.Ed.2d 141 (2012).  *See gen., United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression.").


**Analysis of the Sept. 6 Affidavit.**

The Court has examined the 40-page affidavit submitted by DEA Agent Brendan Cryan (DN 137, Ex. 3).  The District Court reviewed and approved the affidavit and application

for interception of electronic communications on Sept. 6, 2011.  The affidavit itself consists of eleven parts (Id.).  Part 1 identifies the target telephone, the target subjects, the named offenses of the investigation and the anticipated nature of the communications to be intercepted (DN 137, Ex. 3, pp. 1-4, ¶¶1-8).  Target phone I is the cell phone of Donte Pullum who, along with Detrick Houseal and Jeffrey Driskell, are identified as being the target subjects of the investigation (Id, p. 2-3, ¶4a-d).

The investigation itself is described by the affidavit to involve federal crimes of possession with intent to distribute controlled substances, 21 U.S.C. §841; conspiracy to distribute controlled substances, 21 U.S.C. §846; use of communication facilities to further the distribution of controlled substances, 21 U.S.C. §846(b); conducting a continuing criminal enterprise, 21 U.S.C. §848; money laundering, 18 U.S.C. §1956(a)(1); conspiracy to launder money, 18 U.S.C. §1856(h); and, being a felon in possession of a firearm, 18 U.S.C. §922(g)(1). (DN 137, Ex. 3, p. 3, ¶5e).

Part I of Agent Cryan's affidavit then continues to specify the nature of the communications that law enforcement officials expect to intercept (Id., p. 4, ¶7).  These communications include conversations that involve the nature, extent and method of the targets' illegal controlled substance trafficking, the identities and the roles of any co-conspirators, the distribution and transfer of drug trafficking proceeds, the existence and location of drug trafficking records, the location and source of money used to finance drug trafficking activities, along with the location of any items used to further such illegal activities (Id.).

Part II of Agent Cryan's affidavit provides background information on the target subject Pullum, and the target interceptees, Houseal and Driskell.  (DN 137, Ex. 3, pp. 5-9, ¶9).

16

The affidavit indicates that all three of these individuals have prior criminal arrests and/or convictions (Id.).  Pullum, according to the affidavit, was convicted of trafficking in cocaine within 1000 yards of a school in 1998, along with other criminal offenses the following year, and again in 2002 (DN 137, Ex. 3, p. 5, ¶9a) .  Detrick Houseal was arrested for cocaine trafficking in August of 1999 (Id., p. 6, ¶9b).  According to the affidavit, agents observed Houseal's vehicle parked at Pullum's residence during the cocaine transaction involving Robert Posey in April of 2010.  Further, agents had observed Pullum driving automobiles registered to Houseal thereafter (Id.).  The affidavit continues to relate that Jeffrey Driskell, a suspected member of Pullum's drug trafficking organization also on at least one occasion drove Pullum's Pontiac G8 sedan, and apparently met with Pullum at Driskell's home at 4129 Dover Road regularly.  Driskell was arrested by Immigration and Customs Enforcement on May 7, 2010, for allegedly distributing controlled substances (Id.).

Part III of the affidavit sets forth the goals of the investigation (DN 137, Ex. 3, p. 9-10, ¶10).  Among the listed goals are (1) the identification of all of the members of Pullum's drug trafficking organization, (2) the determination of the role of each of these members in the organization,  and (3) the generation of sufficient evidence to arrest them and to dismantle the organization at all levels (Id.).  Also identified as one of the investigative goals is the identification the sources of marijuana and cocaine supply for Pullum's organization, where the organization has been determined to have multiple sources located outside the state of Kentucky in both Indianapolis, Indiana and Memphis, Tennessee.  Accordingly, Agent Cryan expressed his belief that Title III interceptions of wire communications on Pullum's cell phone would assist in identifying the hierarchy within his drug trafficking organization, would provide information on

his sources of drug supply, and would reveal previously unknown, high level members of the organization (Id., p. 10, ¶11).

Part IV of Agent Cryan's affidavit contains the meat of the affidavit (DN 137, Ex. 3, pp. 10-21, ¶¶12-36).  This portion sets forth a detailed description of the Pullum drug trafficking investigation to date.  The Court has previously summarized the contents of this portion of the affidavit.  Without restating in full detail the investigative history, the affidavit sets out in chronological fashion the progress of the investigation based on information obtained from the CS and cooperating defendants, evidence obtained from the trash pulls conducted at 2203 Amboy Drive, electronic surveillance conducted on Pullum during his round-trip from Louisville to Indianapolis on July 16-17, 2011, events related to the marijuana seizure from the white GMC van accompanying the Pontiac G8 during the return trip from Memphis, Tennessee on Aug. 2, 2011, and information obtained from the surveillance maintained on Pullum during Aug. 14-16, 2011 (DN 137, Ex. 3, pp. 10-21, ¶¶12-36).

Contrary to the arguments of the Defendants, nothing indicates to the Court that this portion of the affidavit, or the affidavit itself for that matter, has been intentionally structured to mislead the reader as to the nature or the extent of the Government's investigation. The affidavit at Part IV is set forth in chronological order for the most part.  It merely describes the significant investigative events as they occurred.  The dates of the relevant events are clearly set forth.  No objective reader would be misled as to either the nature or the extent of the investigation merely by reading the contents of Part IV.  To the extent that the Defendants suggest otherwise-- that the Government intentionally attempted to create the false impression that a more substantial investigation had occurred-- Defendants' arguments are completely

unpersuasive.  The affidavit is readily comprehendible and requires no extraordinary time or effort to understand the course of the investigation described therein.

The affidavit at Part IV, as the Defendants correctly point out, does identify certain successes through the use of traditional investigative devices.  For example, the CS and cooperating individuals from the  McCarthy organization, did advise the agents that Pullum had purchased cocaine from McCarthy's drug trafficking organization.  Surveillance conducted on McCarthy's deliveryman, Robert Posey, likewise appeared to confirm that on April 5, 2010, Posey delivered approximately 5 kg. of cocaine to Pullum's residence at 2203 Amboy Drive while Tyron Jenkins followed along behind Posey (DN 137, Ex. 3, pp. 10-12, ¶¶12-16).

Police were able to obtain at least one suspect phone number during their initial trash pull from the residence on Jun 22, 2011.  (Id., pp. 12-13, ¶17).  Using a combination of fixed video surveillance, GPS tracking data and toll records for Pullum's cell phone, police also were able to determine that Pullum traveled to Indianapolis, Indiana in his Pontiac G8 on July 16, where he remained for several hours before returning in the early morning hours of July 17 (DN 137, Ex. 3, pp. 13-14, ¶¶18-23).  He was then observed making multiple, brief stops in the Louisville area on July 17, which the investigating agents interpreted to be drug deliveries.  His telephone toll records likewise showed 21 cell phone calls to Derick Houseal during this brief period of time (Id., p. 14, ¶22).

These limited successes were not the only ones obtained by traditional investigative techniques.  Law enforcement agents were able to monitor the travel of Pullum's Pontiac G8 to Memphis, Tennessee, where it apparently picked up a marijuana shipment that was being transported back to Louisville in the white GMC van driven by Evelyn Garcia before

19

the van was stopped outside of Bowling Green, Kentucky, and the marijuana seized by the

Kentucky State Police (DN 137, pp. 15-17, ¶¶24-27).  Agents also during August 14-16, 2011,

were able to track Pullum's gold Hummer H2, which led them to a commercial garage where

Pullum met with two other individuals whom police followed (Id., pp. 17-21, ¶¶28-36).  Agents

were able to observe Pullum loading black bags suspected to contain either marijuana or cocaine

into the back of the Hummer on Aug. 15, and thereafter monitored his movements as he drove

about Louisville, again apparently making drug deliveries (Id., pp. 19-21, ¶¶33-36).  During this

time, toll records of Pullum's phone showed repeated calls to specific phone numbers, some of

which have no subscriber information available.

   To the extent described above, investigation of Pullum's alleged drug trafficking

organization using traditional methods can accurately be described as being partially successful.

Agents were able to monitor Pullum's whereabouts as well as the location of certain of his

vehicles.  They had access to his cell phone records that would reveal the number of calls he

made or received, along with the phone numbers involved.  This success, of itself, however, does

not automatically negate the necessity for a Title III authorization for interception of electronic

communications.

   As noted, "the mere fact that some investigative techniques were successful in

uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap

surveillance." *Stewart*, 306 F.3d at 305 (citing *Lambert*, 771 F.2d 83, 91 (6th Cir. 1985)).  Such

successes notwithstanding, the Government simply could not have uncovered the full scope of

the alleged drug trafficking conspiracy with the traditional investigative methods used to that

point.  For example, agents had no means of identifying the individuals that Pullum spoke to on

20

his cell phone where no subscriber information existed for certain of the phone numbers that he repeatedly called at critical times both before and after the alleged receipt of drug shipments.

Agents also had no means to determine by traditional investigative techniques who the out-of-state suppliers were in both Memphis and Indianapolis.  Without the content of intercepted electronic communications, the agents could not unravel the hierarchy and organizational structure of Pullum's alleged drug trafficking organization.  As the Sixth Circuit has repeatedly suggested, Title III wiretap authorization is particularly appropriate in the investigation of large scale drug trafficking organizations given the defendants' heavy reliance on cellular phone communication, just as in the present case.  *Stewart*, 306 F.3d at 305; *Landmesser*, 553 F.2d at 20 ("Wiretapping is particularly appropriate when the telephone is routinely relied on to conduct a criminal enterprise under investigation"); *United States v. Woods*, 544 F.2d 242, 257 (6th Cir. 1876) (Even significant opportunities for undercover infiltration would not alleviate "difficulty in learning all of the complex details of the widespread [drug] organization, and its aiders and abettors."

Here, wiretap authorization likewise was particularly appropriate given the heavy reliance on cell phone communications by the target subject Donte Pullum.  Toll analysis set forth in Part V of the Sept. 6 affidavit reveals that during the 30-day period ending on Aug. 17, 2011, Pullum made or received a total of 1,585 phone calls from his cell phone, or almost 53 calls a day.  Of these many cell phone calls, 93 were made to or received from Derick Houseal (DN 137, Ex. 3, p. 21, ¶37a).  An astonishing 415 calls were made to or received from (502) 669-2107, a phone for which law enforcement had no subscriber information (Id., ¶37e).  Without authorization for a Title III wiretap, law enforcement officers would have no traditional

21

means to possibly identify the user of this particular phone number despite his or her significant involvement in Pullum's activities.

Authorized interception of electronic communications was the only means by which agents could hope to discover Pullum's sources of supply in Indiana and Tennessee, the identify all of his drug trafficking organization's members and their hierarchy within the organization, as well.  Accordingly, the limited success achieved by traditional investigative techniques might have been sufficient, as explained in *Dickerson*, 651 F. Supp.2d at 741-42, if the Government's sole goal was simply to arrest Donte Pullum on drug charges, rather than attempt to take down his entire multi-state drug trafficking organization. Accomplishment of the government's broader goals simply was not possible without the authorized interception of electronic communications obtained by Agent Cryan on September 6 and October 11, 2011.

Defendants challenge the next portion of the affidavit, Part VII, the section setting forth the necessity for Title III authorization, as being mere boilerplate devoid of any significant connection to the facts of the investigation (DN 137, Ex. 3, pp. 23-37, ¶¶39-71).  If that were so, the affidavit would perhaps be the type of "purely conclusory affidavit unrelated to the instant case" that might be held inadequate to comply with 18 U.S.C. §2518(1)(c).  *Landmesser*, 553 F.2d at 20; *Williams*, 693 F. Supp.2d at 751; *Kelley*, 596 F. Supp.2d at 1147-48 (rejecting the "mere boilerplate" argument in the context of a Title III affidavit).

Review of each of the relevant sections of Part VII, however, persuades the Court that Agent Cryan's affidavit was not purely conclusory boilerplate as the Defendants insist. Rather, Agent Cryan in each of the sections on traditional investigative techniques made specific reference to the facts of his case and their specific relation to the limitations of such investigative

22

techniques.  For example, in the section on pen register traps and traces, Agent Cryan explained

that physical surveillance of Pullum revealed his use of multiple cell phones.  Agent Cryan

explained how information obtained from pen registers could not reveal the identity of members

of the organization that use cell phones with no subscriber information (DN 137, Ex. 3, pp. 24-

25, ¶¶42-44).

Agent Cryan in the following section on undercover agents and confidential

sources likewise related the facts surrounding the cooperation provided by two members of the

McCarthy drug organization in April of 2010 (Id., pp. 25-26, ¶45).  Agent Cryan discussed the

unsuccessful efforts to persuade Evelyn Garcia to cooperate following her arrest on August 2,

2011, outside of Bowling Green, when Kentucky State Troopers stopped the white GMC van

containing seven bags of marijuana (Id., p 26, ¶¶46-47).

As Agent Cryan pointed out, Garcia refused to cooperate and did not know any

information concerning Pullum due to the compartmentalized nature of the alleged drug

trafficking organization, which as Agent Cryan pointed out, limits the scope of information that

can be obtained by confidential informants and cooperating witnesses.  Thus, Agent Cryan

correctly related the facts of his case involving a potential informant to the limitations of

traditional investigative techniques.  He also pointed out the possibility of misinformation such

as that provided by Jeffrey Driskell and his passenger following the stop of the Pontiac G8 that

Driskell was driving as the lead car for the van on Aug. 2, 2011.  Driskell provided law

enforcement officers only with a highly unlikely alibi and no useful information concerning

Pullum (Id., p. 27, ¶47).

Agent Cryan in the next section of Part VII discussed the limits of physical

surveillance (DN 137, Ex. 3, pp. 29-31, ¶¶53-59).  In doing so, he directly referred to the earlier portion of his affidavit at paragraphs 16-36, which sets forth in detail the facts obtained through physical surveillance of Pullum at various times during the course of the investigation.  Agent Cryan recounted surveillance that showed Pullum repeatedly traveling to multiple hotels in the Louisville area on various occasions, where he stayed for very brief periods of time before continuing on to other locations where he also made brief stops (Id., pp. 29-39, ¶54).

As Agent Cryan pointed out, this physical surveillance in June, July and August of 2011, could not conclusively establish the purpose of these meetings (Id., p. 30, ¶55). Without the interception of wire communications, law enforcement officials would be required to maintain blanket, or continuous, surveillance which would dramatically increase the possibility of their detection while potentially compromising their own safety (Id., pp. 30-31, ¶¶56-57).  Such physical surveillance also would not have established the roles of the alleged conspirators within the organization as Agent Cryan again correctly pointed out (Id., p. 31, ¶58).

Section D of Part VII discusses the use and limitations of fixed camera video surveillance (DN 137, Ex. 3, pp. 31-32, ¶¶60-61).  As before, Agent Cryan sets forth the material facts that relate to the installation of the fixed video camera outside Pullum's 2203 Amboy Drive residence(Id.).  He notes that this fixed video surveillance had recorded Pullum meeting with various alleged members of the drug trafficking organization at his residence, but camera surveillance only showed activity that occurred around the driveway and the side door of the residence when a vehicle entered or left the property (Id., p. 32, ¶60).  While agents had considered using additional fixed video surveillance cameras, traditional investigative techniques had not identified all of the other potential locations which might be a drug storage facility (Id.).

24

Accordingly, Agent Cryan conceded that such surveillance had on at least one occasion indicated Pullum's home had been used for cocaine trafficking with the McCarthy organization, but fixed video surveillance did not appear capable of ferreting out the full membership of Pullum's suspected organization, its source of supply or its hierarchy of members.

Agent Cryan also discussed the feasibility of search warrants as an investigative tool in Part VII of the affidavit (DN 137, Ex. 3, pp. 32-33, ¶62).  As he noted, surveillance and pen register trap and trace information had revealed the existence of a number of locations that could be used as "stash houses" for illegal drugs or drug proceeds.  The problem, however, in Cryan's situation was that physical surveillance, trash pulls and pen register authorization had failed to produce sufficient evidence to establish probable cause for the issuance of a search warrant and appeared unlikely to do so according to the agent (Id., p. 33, ¶62a).

In this regard, Agent Cryan once again made specific reference to the facts of his case by identifying those locations (2203 Amboy Drive, 1720 Marlow Road and 4802 Pinewood) that the agents considered to be potential locations of interest where drugs or drug money might possibly be located (Id., ¶62b).  Agent Cryan noted, however, that the investigation and traditional investigative techniques had so far failed to identify Pullum's marijuana and cocaine sources or the locations where all members of Pullum's alleged drug trafficking organization conducted drug sales and stored drug proceeds (Id.).  Agent Cryan pointed out logically that the execution of search warrants at any one of these locations could alert the subjects of the investigation, just as the stop of Pullum's Pontiac G8 sedan on Aug. 2, 2011, had caused Pullum to switch vehicles when he thereafter began to drive his gold Hummer (Id., p. 33, ¶62d).  Accordingly, nothing in this portion of Part VII is the type of purely conclusory

25

boilerplate condemned in the *Williams, Kelley* or *Landmesser* decisions.

The same conclusion holds true with even greater force to those portions of Part VII of the affidavit that discuss the limitations in the use of tracking devices and trash pulls (DN 137, Ex. 3, pp. 34-36, ¶¶63-68). In fact, Agent Cryan gives a detailed factual recitation of the use of tracking devices to monitor the movements of various Pullum vehicles in July and August of 2011 (Id., ¶¶63-65). As Agent Cryan correctly points out, the use of secret GPS tracking devices did not permit law enforcement officers to determine who may have been operating the vehicle at issue, or the purpose for which they are operating it; whereas, the interception of electronic communications might well reveal whether the vehicle contained controlled substances, drug traffickers, or currency, along with the itinerary of the driver (Id.).

As for the portion of the affidavit related to trash searches, it too sets forth the factual circumstances of the three trash pulls conducted at Pullum's Amboy Drive residence in June and July of 2011 (DN 137, Ex. 3, pp. 35-36, ¶¶67-68). These trash pulls, as Agent Cryan noted, proved to be largely ineffective. At most, only a single phone number was obtained as a result of the initial pull on June 22, 2011 (Id., p. 35, ¶67). Given the limited productivity of trash pulls and the risk of detection by neighbors or other passersby, Agent Cryan reasonably concluded that this traditional investigative technique, even when combined with the other techniques discussed above, was limited at best.

The remaining three subsections of Part VII deal with traditional investigative techniques minimally employed in the Pullum investigation. They include administrative subpoenas (Id., pp. 36-37, ¶69), grand jury subpoenas (Id., p. 37, ¶70), and interviews of the target subjects (Id., pp. 37-38, ¶71). Cryan acknowledged that administrative subpoenas had

26

enabled the agents to obtain cell phone analysis for Pullum's phone and subscriber information (Id., p. 36, ¶69).  The information obtained by this investigative technique, however, could not reveal the identity of those members of Pullum's alleged organization that use prepaid cell phones with no subscriber information (Id.).

Likewise, interviews with individuals having suspected involvement, such as Evelyn Garcia, Jeffrey Driskell and Juan DeJesus Martinez, produced little or no information, as Agent Cryan accurately described in the affidavit (Id., p. 37, ¶71).  Driskell and Martinez provided misinformation.  Garcia refused to cooperate.  These factual circumstances directly confirm the limitations of this traditional investigative technique.  The same reasoning applies to the potential use of grand jury subpoenas, which would alert potential co-conspirators to the existence of the investigation, without providing any guarantee of helpful testimony, or testimony at all, as Agent Cryan again correctly notes (Id., p. 37, ¶70).  If Driskell, Garcia and Martinez would not speak informally with investigators, as the facts of the investigation set forth in the affidavit confirm, then it is hardly more likely that they would testify under oath before a grand jury.

In sum, Part VII and its discussion of the necessity for the authorization of a  Title III wiretap easily meets the necessity requirement of 18 U.S.C. §2518(1)(c).  Nothing suggests that this portion of Agent Cryan's affidavit is "purely conclusory" or "mere boilerplate" devoid of any factual background related to the investigation.  To the contrary, the opposite is true. Agent Cryan has gone to some length in Part VII of the affidavit to discuss the potential limitations of traditional techniques in the context of the Pullum investigation.  Further, Part VII of the affidavit cannot be read in isolation, but must be read in conjunction with Part IV, the

27

lengthy section of the affidavit on the facts and circumstances of the Pullum investigation. When these two parts of the affidavit are read in conjunction in a commonsense fashion in light of the practical realities of police investigation of large-scale drug trafficking organizations, it becomes immediately clear that the §2518(1)(c) adequacy of the Sept. 6 affidavit is not in any sense a close question. *Dickerson*, 651 F. Supp.2d at 742.

## CONCLUSION

The Sixth Circuit has routinely held that Title III wiretap authorizations are particularly appropriate when law enforcement officials are faced with the daunting task of investigating large-scale, multi-state drug trafficking organizations that rely heavily upon the use of cellular phone communications to conduct their illegal activities.  Here, Donte Pullum, the target subject of the investigation, appeared to agents to be operating just such a drug trafficking organization with sources of supply in both Indiana and Tennessee.  Pullum in conducting his alleged drug trafficking made extensive use of cell phone communications such that a single 30-day time period included over 1,500 made or received calls on his cell phone.  A substantial portion of these calls were made to or received from individuals for whom no subscriber information was available.

While traditional investigative techniques had produced initial success in monitoring the whereabouts of certain of Pullum's vehicles, and Pullum himself had been observed on various dates in public engaged in arranging suspected illegal drug transfers, traditional investigative techniques simply were insufficient for the agents to determine the identity of all the individuals involved in Pullum's alleged organization, their hierarchy within

28

that organization, and the sources of supply for it.

The original Sept. 6 affidavit of Agent Cryan, as well as the subsequent affidavit, both carefully set out in exacting detail an accurate history of the investigation and the limitations of the traditional investigative techniques used.  The affidavit amply demonstrates that wiretap authorization was not sought as a first step, and that agents made full use of traditional techniques prior to the time that they applied for Title III authorization.  The affidavits therefor readily satisfy the requirements of § 2518(1)(c).  For all of these reasons, the motion to suppress filed by the Defendants should be denied.

## RECOMMENDATION

The Magistrate Judge having made findings of fact and conclusions of law recommends that the joint motion of the Defendants to suppress intercepted communications be **DENIED**.

## NOTICE

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived.  *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd.*, 474 U.S. 140 (1985).  28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Copies to Counsel of Record